IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

GORDON W. DYER,

        Plaintiff,

v.

BANK OF AMERICA, N.A.,
EQUIFAX INFORMATION SERVICES LLC;
EXPERIAN INFORMATION SOLUTIONS INC.; and
TRANS UNION LLC,

        Defendants.

## COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL

1. An identity thief stole Plaintiff Gordon W. Dyer's identity and obtained a credit card in Mr. Dyer's name issued by Defendant Bank of America, N.A. The identity thief then had funds transferred from the Bank of America credit card to an account with a North Carolina bank that the identity thief had opened. The North Carolina bank investigated the matter and determined that Mr. Dyer had been the victim of identity theft. However, despite Mr. Dyer's repeated disputes for the last nine months with Bank of America and through the three national credit reporting agencies, Defendants Equifax Information Services LLC, Experian Information Solutions Inc. and Trans Union LLC, including providing Defendants with the results of the North Carolina bank's investigation, Defendants still refuse to remove the false and derogatory reporting by Bank of America concerning the identity theft account from Mr. Dyer's credit reports. As a result, Mr. Dyer's credit reputation has been ruined.

## Jurisdiction and Venue

2.  This Court has jurisdiction under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA"), 15 U.S.C. § 1681p, and under 28 U.S.C. §§ 1331 and 1337, and it has supplemental jurisdiction over the state claims under 28 U.S.C. § 1367. The events took place in this District.

## Parties

3.  Plaintiff Gordon W. Dyer resides in Hobbs, New Mexico. He is a "consumer" as defined by the FCRA, 15 U.S.C. § 1681a(c) and the New Mexico Credit Bureaus Act ("CBA"), NMSA 1978 § 56-3-1.

4.  Defendant Bank of America, N.A. is a national bank that is a "furnisher of information" as contemplated by the FCRA, 15 U.S.C. § 1681s-2(b), who regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about consumer transactions.

5.  Defendant Equifax Information Services LLC is a foreign corporation that is a "consumer reporting agency" as defined by the FCRA, 15 U.S.C. § 1681a(f), and a "credit bureau" as defined by the CBA, NMSA 1978 § 56-3-1. Equifax assembles consumer credit information or other information on consumers for the purpose of furnishing credit reports to third parties. It uses means of interstate commerce for the purpose of preparing or furnishing credit reports.

6.  Defendant Experian Information Solutions Inc. is a foreign corporation that is a "consumer reporting agency" as defined by the FCRA, 15 U.S.C. § 1681a(f), and a "credit bureau" as defined by the CBA, NMSA 1978 § 56-3-1. Experian assembles consumer

credit information or other information on consumers for the purpose of furnishing credit reports to third parties. It uses means of interstate commerce for the purpose of preparing or furnishing credit reports.

7.    Defendant Trans Union LLC is a foreign corporation that is a "consumer reporting agency" as defined by the FCRA, 15 U.S.C. § 1681a(f), and a "credit bureau" as defined by the CBA, NMSA 1978 § 56-3-1. Trans Union assembles consumer credit information or other information on consumers for the purpose of furnishing credit reports to third parties. It uses means of interstate commerce for the purpose of preparing or furnishing credit reports.

## Facts

### Facts Concerning Bank of America

8.    In September 2008, Mr. Dyer received a letter from Bank of America regarding the identity theft account in which Bank of America stated "we were alerted to the possibility that the above-referenced account was fraudulently opened."

9.    On October 3, 2008, Mr. Dyer faxed Bank of America a completed fraud affidavit along with copies of his driver license and a second document that showed his address.

10.   In a letter dated November 13, 2008, Bank of America informed Mr. Dyer that it intended to hold him responsible for $8,800 that the identity thief had obtained from the credit card account and had transferred to Branch Bank & Trust in North Carolina in May 2008.

11.   Mr. Dyer has never lived in North Carolina.

12.   Mr. Dyer never authorized the opening of the Bank of America identity theft account in his name.

13.    Mr. Dyer never authorized the opening of any Branch Bank & Trust accounts in his name.

14.    Mr. Dyer never received any money as a result of the transfer from the Bank of America
       identity theft account to the Branch Bank & Trust account.

15.    Mr. Dyer does not know how the Bank of America identity theft account was opened in
       his name nor does he know how the Branch Bank & Trust accounts were opened in his
       name.

16.    After receipt of the November 13 letter, Mr. Dyer requested that Bank of America
       provide him with documents concerning the opening of the identity theft account.

17.    With a letter dated December 3, 2008, Bank of America provided Mr. Dyer with a print
       out that showed information concerning the identity theft account, including an address in
       Raleigh, North Carolina, that the identity thief used in opening the account.

18.    Bank of America did not provide Mr. Dyer with any application for the identity theft
       account.  Nor did Bank of America provide Mr. Dyer with any document that showed a
       signature by the person that opened the account.

19.    Mr. Dyer sent Bank of America's Fraud Department a letter dated December 4, 2008, in
       which he explained that the transfers from the identity theft account were the result of
       identity theft.  Mr. Dyer explained that he is an optometrist who was working in Hobbs,
       New Mexico, on the date of the first transfer to the North Carolina bank and, as proof,
       Mr. Dyer provided his patient schedule for this date.  Mr. Dyer asked Bank of America to
       compare his signature and the photograph of him on his driver license with the documents
       that Bank of America should have collected from the person that opened the identity theft
       account.  Mr. Dyer requested that Bank of America conduct a reasonable investigation

4

into the identity theft account and that it not report derogatory information about the

account to any credit reporting agencies until the investigation was completed "or at the

very least, my credit report should be updated to reflect my dispute." Mr. Dyer also

renewed his request for copies of actual account documents, including a copy of the

application used to open the identity theft account.

20. Bank of America's Fraud Department received the December 4 letter and the supporting

documents by fax on December 5, 2008, and by mail on December 8, 2008.

21. Mr. Dyer contacted Branch Bank & Trust and asked it for assistance with Bank of

America, as Bank of America refused to absolve Mr. Dyer from liability for the transfers

made to the Branch Bank & Trust account.

22. In response, Branch Bank & Trust provided Mr. Dyer with a signed letter, on Branch

Bank & Trust letterhead, dated December 26, 2008, that states:

This letter is in reference to Gordon W. Dyer. In March of 2008 Mr. Dyer became
a victim of Identity Theft at our Financial Institution. There were two accounts
opened using his name and social security number. The accounts were opened in
North Carolina with a false address. There was a loss on one of the accounts. All
accounts have been closed and a request to have them removed from Mr. Dyer's
credit report is in process. Mr. Dyer is not responsible for the accounts opened at
BB&T or any loss that has occurred.

23. On December 26, 2008, Branch Bank & Trust faxed its December 26 letter to Bank of

America's Fraud Department, with a cover letter in which it directed the fax to George

Garcia, the person with whom Mr. Dyer had been communicating, and wherein it

indicated that the fax concerned "Gordon W. Dyer ID Theft."

24. Mr. Dyer contacted the police department in Raleigh, North Carolina, which is the city

listed by the identity thief as his or her address at the time of the opening of the identity

5

theft account.  The identity thief also listed the Raleigh address when he or she opened

the Branch Bank & Trust accounts.  Mr. Dyer asked the Raleigh Police Department what

he needed to do to file a police report concerning the identity theft.  The police

department told Mr. Dyer to obtain the date that the credit card account was opened and

the documents used to open the account.

25.   In a letter dated January 5, 2009, to Bank of America's Fraud Department, Mr. Dyer

stated:

> In order for me to file my report as a victim of identity theft with the Raleigh, NC
> police department, please immediately send me the date that the above Visa
> account was applied for, what forms in total of identification Bank of America
> examined in the course of opening this account, and the name and physical
> address of the location where this account was applied for.

26.   Bank of America's Fraud Department received the January 5 letter by fax on January 5,

2009, and by mail on January 8, 2009.

27.   Bank of America never provided the information or documents that Mr. Dyer requested in

the January 5 letter.

28.   In a letter dated February 5, 2009, Bank of America threatened to sue Mr. Dyer unless he

started making payments on the identity theft account.

29.   Mr. Dyer sent the January 5 letter to Bank of America's Fraud Department a second time.

30.   Bank of America's Fraud Department received the January 5 letter for the second time on

February 9, 2009.

31.   Bank of America ignored the requests in Mr. Dyer's January 5 letter a second time.

32.   Through the course of disputing the identity theft account, Mr. Dyer, along with his wife, Deanna Dyer, placed several telephone calls to Bank of America in attempts to resolve the matter.

33.   In a letter dated April 24, 2009, sent to both Bank of America's general address as well as to the address for its Fraud Department, Mr. Dyer again requested that Bank of America delete the identity theft account from his credit reports.  Mr. Dyer included with the letter to Bank of America the letters that bear the same date that he sent to the three credit reporting agencies as well as all the supporting documents that he had included with these letters.

34.   Included with these supporting documents is the December 26 letter from Branch Bank & Trust.

35.   Included with these supporting documents sent is a letter dated April 6, 2009, from Branch Bank & Trust's attorney, in which the attorney provides a summary of the activity that took place on the Branch Bank & Trust accounts opened in Mr. Dyer's name. Attached to this attorney letter (and included in the documents provided to Bank of America) are documents concerning the Branch Bank & Trust accounts, including copies of signature cards.

36.   The signatures on these signature cards do not match the signature on Mr. Dyer's driver license.

37.   On April 30, 2009, Bank of America received the letter to it dated April 24, at its general address as well as at its Fraud Department address, along with copies of the letters that

bear the same date that Mr. Dyer had sent to the three credit reporting agencies, as well as all the supporting documents.

38.   Nevertheless, Bank of America is still reporting the identity theft account derogatorily on Mr. Dyer's credit reports.

39.   Currently, Bank of America claims that Mr. Dyer owes it approximately $15,000 due to the identity thefts account.

### Facts Concerning Equifax

40.   Equifax provided Mr. Dyer a copy of his Equifax credit report dated March 3, 2009.

41.   On Mr. Dyer's March 3 Equifax credit report, no notation exists that indicates that Mr. Dyer disputes the Bank of America identity theft account.

42.   In a letter to Equifax dated April 24, 2009, Mr. Dyer requested that Equifax investigate the Bank of America identity theft account and delete the account from his credit report. Mr. Dyer included with this letter several documents in support of his dispute.

43.   Included with these supporting documents is the December 26 letter from Branch Bank & Trust.

44.   Included with these supporting documents is the April 6 letter from Branch Bank & Trust's attorney and the documents that the attorney had attached to this letter, including copies of signature cards.

45.   Included with these supporting documents is a copy of Mr. Dyer's driver license.

46.   On May 1, 2009, Equifax received the letter to it dated April 24, as well as all the supporting documents.

47.   In a letter to Mr. Dyer dated May 5, 2009, in regard to the Bank of America identity theft account, Equifax stated that it had "verified that this item belongs to you."

48.   In response to the April 24 dispute, Equifax refused to remove the Bank of America identify theft account from Mr. Dyer's credit file.

49.   Equifax is still reporting the identity theft account derogatorily on Mr. Dyer's Equifax credit report.

## Facts Concerning Experian

50.   On January 5, 2009, via a form provided by Experian, Mr. Dyer disputed the Bank of America identity theft account as not his account, in follow up to a dispute initiated by telephone. He included with the dispute form a copy of his driver license.

51.   Experian received this dispute form and the copy of Mr. Dyer's driver license on January 13, 2009.

52.   In a letter to Mr. Dyer dated January 27, 2009, in regard to the Bank of America identity theft account, Experian stated:

THE CREDIT GRANTOR MAY NOT KNOW HOW TO CONTACT YOU TO
DISCUSS THIS MATTER. THE CREDIT GRANTOR REQUESTS THAT
YOU CONTACT THEM DIRECTLY 800 421 2110.

53.   In response to the January 5 dispute, Experian refused to remove the Bank of America identify theft account from Mr. Dyer's credit file.

54.   Experian provided Mr. Dyer a copy of his Experian credit report dated January 27, 2009.

55.   The Bank of America identity theft account is the only negative trade line on Mr. Dyer's January 27 Experian credit report.

56.   On Mr. Dyer's January 27 Experian credit report, Experian notes that the Bank of
       America identity theft account was "verified and updated on Jan 2009."

57.   On Mr. Dyer's January 27 Experian credit report, no notation exists that indicates that
       Mr. Dyer disputes the Bank of America identity theft account.

58.   In a letter to Experian dated April 24, 2009, Mr. Dyer requested that Experian investigate
       the Bank of America identity theft account and delete the account from his credit report.
       Mr. Dyer included with this letter several documents in support of his dispute.

59.   Included with these supporting documents is the December 26 letter from Branch Bank &
       Trust.

60.   Included with these supporting documents is the April 6 letter from Branch Bank &
       Trust's attorney and the documents that the attorney had attached to this letter, including
       copies of signature cards.

61.   Included with these supporting documents is a copy of Mr. Dyer's driver license.

62.   On April 30, 2009, Experian received the letter to it dated April 24, as well as all the
       supporting documents.

63.   In a letter to Mr. Dyer dated May 4, 2009, Experian stated that it "was not able to use" the
       information – and presumably the documents – that Mr. Dyer had sent to it in support of
       his dispute.

64.   In a letter to Mr. Dyer dated May 16, 2009, in regard to the Bank of America identity theft
       account, Experian stated:

       THE CREDIT GRANTOR MAY NOT KNOW HOW TO CONTACT YOU TO
       DISCUSS THIS MATTER.  THE CREDIT GRANTOR REQUESTS THAT
       YOU CONTACT THEM DIRECTLY 800 421 2110.

10

65.   In response to the April 24 dispute, Experian refused to remove the Bank of America identify theft account from Mr. Dyer's credit file.

66.   Experian is still reporting the identity theft account derogatorily on Mr. Dyer's Experian credit report.

### Facts Concerning Trans Union

67.   Trans Union provided Mr. Dyer a copy of his Trans Union credit report dated March 23, 2009.

68.   The Bank of America identity theft account is the only adverse trade line on Mr. Dyer's March 23 Trans Union credit report.

69.   On Mr. Dyer's March 23 Trans Union credit report, no notation exists that indicates that Mr. Dyer disputes the Bank of America identity theft account.

70.   In a letter to Trans Union dated April 24, 2009, Mr. Dyer requested Trans Union investigate the Bank of America identity theft account and delete the account from his credit report.  Mr. Dyer included with this letter several documents in support of his dispute.

71.   Included with these supporting documents is the December 26 letter from Branch Bank & Trust.

72.   Included with these supporting documents is the April 6 letter from Branch Bank & Trust's attorney and the documents that the attorney had attached to this letter, including copies of signature cards.

73.   Included with these supporting documents is a copy of Mr. Dyer's driver license.

74.   On April 30, 2009, Trans Union received the letter to it dated April 24, as well as all the supporting documents.

75.   In a letter to Mr. Dyer dated May 6, 2009, Trans Union stated that it was "unable to accept the documentation you sent."

76.   In a letter to Mr. Dyer dated May 11, 2009, in regard to the Bank of America identity theft account, Trans Union stated that it had "verified" the account and that "no change" would be made to how it was reporting the account.

77.   In response to the April 24 dispute, Trans Union refused to remove the Bank of America identify theft account from Mr. Dyer's credit file.

78.   Trans Union is still reporting the identity theft account derogatorily on Mr. Dyer's credit report.

## Facts Concerning All Defendants

79.   Upon information and belief, with each dispute received from Mr. Dyer by Equifax, Experian and Trans Union, these credit reporting agencies sent information concerning the dispute to Bank of America and Bank of America received the information.

80.   Defendants refused to perform a genuine and reasonable investigation into Mr. Dyer's disputes.

81.   Defendants failed to review and consider all relevant information submitted by Mr. Dyer in connection with his disputes.

82.   Defendants persisted in reporting information that they knew or should have known to be inaccurate and damaging to Mr. Dyer.

83.     If Defendants had conducted a genuine and reasonable investigation into Mr. Dyer's

        disputes, they would have deleted the Bank of America identity theft account from Mr.

        Dyer's credit reports.

84.     As a result of the actions and inactions of Defendants, Mr. Dyer suffered actual damages,

        including:

        a.      damage to his credit rating;

        b.      damage to his creditworthiness;

        c.      lost time;

        d.      out-of-pocket expenses;

        e.      humiliation and embarrassment; and

        f.      aggravation and frustration.

        **First Claim for Relief: FCRA Violations by Bank of America**

85.     Bank of America:

        a.      failed to review and consider all relevant information submitted by Mr. Dyer in

                connection with his disputes;

        b.      failed to conduct a genuine and reasonable reinvestigation in response to Mr.

                Dyer's disputes;

        c.      failed to report that the information that it reported about the identity theft account

                is inaccurate;

        d.      failed to report that Mr. Dyer disputed the identity theft account; and

        e.      persisted in reporting information that it knew or should have known to be

                inaccurate and damaging.

86.     Bank of America's actions are willful or, in the alternative, negligent, violations of the
        FCRA, including 15 U.S.C. § 1681s-2(b).

87.     Mr. Dyer is entitled to actual damages and punitive damages, plus costs and reasonable
        attorney fees.

**Second Claim for Relief: FCRA Violations by Equifax, Experian and Trans Union**

88.     Equifax, Experian and Trans Union failed to maintain reasonable procedures to ensure
        the maximum possible accuracy of the consumer credit information that they reported
        concerning Mr. Dyer.

89.     Equifax, Experian and Trans Union:

        a.      failed to review and consider all relevant information submitted by Mr. Dyer in
                connection with his disputes;

        b.      failed to provide Bank of America with all relevant information provided by Mr.
                Dyer in connection with his disputes;

        c.      failed to conduct a genuine and reasonable reinvestigation in response to Mr.
                Dyer's disputes;

        d.      persisted in reporting information that they knew or should have known to be
                inaccurate and damaging; and

        e.      failed to delete inaccurate information from their data files concerning Mr. Dyer
                and from Mr. Dyer's credit reports.

90.     The actions and inactions of Equifax, Experian and Trans Union were willful, or, in the
        alternative, negligent violations of the FCRA, including 15 U.S.C. §§ 1681e(b) and
        1681i.

91.    Mr. Dyer is entitled to actual damages and punitive damages, plus costs and reasonable attorney fees.

### Third Claim for Relief: CBA Violations by Equifax, Experian and Trans Union

92.    The actions and inactions of Equifax, Experian and Trans Union violated the CBA, including but not limited to, NMSA 1978 § 56-3-2.

93.    The actions and inactions of Equifax, Experian, Trans Union were willful, or, in the alternative, negligent violations of the CBA.

94.    Mr. Dyer is entitled to actual damages and punitive damages, plus costs and reasonable attorney fees.

95.    Mr. Dyer is entitled to declaratory and injunctive relief.

### Fourth Claim for Relief:
### Violations of the New Mexico Unfair Practices Act by All Defendants

96.    The actions and inactions of each Defendant concerning the reporting of the Bank of America identity theft account occurred in the regular course of each respective Defendant's trade or commerce.

97.    The actions and inactions of each Defendant violates the New Mexico Unfair Practices Act, NMSA 1978 §§ 57-12-1 *et seq.* ("UPA"), as defined by NMSA 1978 § 57-12-2(D) generally and NMSA 1978 § 57-12-2(D)(14) and (15) specifically.

98.    Each Defendant willfully engaged in these violations of the UPA.

99.    Mr. Dyer is entitled to actual or statutory damages, trebled, plus costs and reasonable attorney fees.

100.   Mr. Dyer is entitled to declaratory and injunctive relief.

15

**Jury Demand**

101.   Mr. Dyer requests trial by six person jury on all issues where a jury trial is available.

**Request for Relief**

Mr. Dyer requests that this Court:

A. Declare that Defendants are reporting the Bank of America identity theft account inaccurately;

B. Enjoin Bank of America from reporting the identity theft account as attributable to Mr. Dyer to any credit reporting agency;

C. Enjoin Equifax, Experian and Trans Union from reporting the Bank of America identity theft account in Mr. Dyer's credit file or on any credit report attributed to Mr. Dyer;

D. Award actual damages and punitive damages against all Defendants under the FCRA;

E. Award actual damages and punitive damages against Equifax, Experian and Trans Union under the CBA;

F. Award actual or statutory damages, trebled, against all Defendants, under the UPA;

G. Award costs and reasonable attorney fees; and

H. Provide such further relief as this Court deems just.

Respectfully submitted,

FEFERMAN WARREN & TREINEN PA

ROB TREINEN
300 Central Ave. SW, Suite 2000 West
Albuquerque, New Mexico 87102
(505) 243-7773
(505) 243-6663 (fax)